2008 UT 89

**POHL, INC. OF AMERICA, Plaintiff and Petitioner,**

v.

**Ron WEBELHUTH; Bret Miller; Dennis Miller; Industrial Sheet Metal Erectors, Inc.; and John Does I through X, Defendants and Respondents.**

No. 20070622.

Supreme Court of Utah.

Dec. 23, 2008.

Rehearing Denied Feb. 11, 2009.

David W. Scofield, Ronald F. Price, Salt Lake City, for petitioner.

Robert F. Babcock, Steven M. Cockriel, Cody W. Wilson, Salt Lake City, for respondents.

PARRISH, Justice:

## INTRODUCTION

¶ 1 This case asks us to decide whether Utah's long-arm statute extends to defendants who allegedly engaged in a conspiracy to tortiously interfere with the plaintiff's contract and economic opportunities. We address whether Utah's long-arm statute provides for jurisdiction over individuals who never physically entered Utah but who conspired to cause tortious injury in Utah, and directed their actions toward Utah knowing that they would cause tortious injury there. We hold that it does.

## BACKGROUND

■ ¶ 2 When reviewing a district court's grant of a motion to dismiss, "we accept the factual allegations in the complaint as true and consider them, and all reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party."[1] We recite the facts accordingly.

1. *MFS Series Trust III v. Grainger,* 2004 UT 61, ¶ 6, 96 P.3d 927 (internal quotation marks omit-

¶ 3 This case arises from the construction of a performing arts center at the University of Missouri–St. Louis (the "Project"). The general contractor for the Project was KCI Construction Company ("KCI"), a Missouri company. KCI's project manager was Ron Webelhuth. KCI hired T.A.B. Company, Inc. ("TAB"), a Missouri corporation, as a subcontractor responsible for supplying panels to be installed on the exterior of the building. Because the architect's specifications for the building called for exterior panels manufactured by Pohl, Inc. of America ("Pohl") or their equivalent, TAB subcontracted Pohl, a Utah corporation, to manufacture and supply the panels. TAB also subcontracted a separate company, Industrial Sheet Metal Erectors, Inc. ("ISME"), to install the panels. ISME is a Missouri corporation. Dennis Miller is the president of ISME, and his son, Bret Miller, is the vice-president. Bret acted as project manager on the TAB job.

¶ 4 In May 2005, Pohl filed suit in Utah against Webelhuth, Bret Miller, Dennis Miller, and ISME (collectively, the "Defendants"), alleging intentional interference with contract, intentional interference with prospective economic relations, and civil conspiracy. Pohl alleges that, beginning in February 2003, tensions began to arise between Pohl, ISME, and KCI regarding the production, delivery, and payment schedule for the panels fabricated by Pohl. According to Pohl, these tensions matured into a conspiracy between Bret Miller, ISME, and Webelhuth to interfere with Pohl's contract with TAB. The object of the conspiracy was to replace Pohl, as the panel supplier, with ISME, which could produce and supply a different type of panel more quickly. To this end, Pohl alleges that the defendants convinced the architect and the owner of the Project to change the project specifications from requiring Pohl panels to requiring panels that could be produced by ISME instead. Pohl also alleges that Webelhuth did not accept any other bids or research any other companies before replacing Pohl with ISME as the panel supplier.

ted).

¶ 5 This conspiracy allegedly commenced on February 17, 2003, when Bret Miller and Webelhuth drafted a letter to Pohl demanding that all of the panels be delivered within two days, a demand that all parties knew was impossible. Bret Miller sent the handwritten draft to TAB, asking TAB to finalize the letter and send it to Pohl in Utah, which TAB did. When the panels did not arrive on February 19, 2003, TAB terminated Pohl's contract and KCI terminated its contract with TAB. After terminating its contract with TAB, KCI entered into a subcontract with ISME to supply substitute panels for the Project.

¶ 6 Pohl filed suit, and the defendants responded with a motion to dismiss for lack of personal jurisdiction, arguing that none of their actions fell within the specifically enumerated acts of Utah's long-arm statute and that there were insufficient minimum contacts between the defendants and the state of Utah. The bulk of their argument focused on the fact that all of the allegedly tortious acts took place in Missouri. The district court agreed and dismissed Pohl's complaint for lack of jurisdiction, concluding that the actions taken by the defendants upon which Pohl based its claims "were performed exclusively in the State of Missouri." Accordingly, the district court found "no nexus between Defendants' contacts with Utah and Plaintiff's claims."

¶ 7 Pohl appealed, and the court of appeals affirmed the district court's conclusion.[2] We granted certiorari to review whether the court of appeals correctly interpreted the Utah long-arm statute, Utah Code section 78B–3–205 (Supp.2008).[3] We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(a) (Supp.2008).

## STANDARD OF REVIEW

¶ 8 "On certiorari, we review for correctness the decision of the court of appeals, not the decision of the district court."[4] "Whether a court has personal jurisdiction over a defendant under Utah law and the Fourteenth Amendment of the United States Constitution is a question of law, which we review for correctness."[5] In a case such as this one, "[w]here a pretrial jurisdictional decision has been made on documentary evidence only, an appeal from that decision presents only legal questions that are reviewed for correctness."[6]

## ANALYSIS

¶ 9 The authority of the state to hale a nonresident into a state court hinges on the ability to establish personal jurisdiction.[7] There are two categories of personal jurisdiction: specific jurisdiction and general jurisdiction. "General personal jurisdiction permits a court to exercise power over a defendant without regard to the subject of the claim asserted" and is dependent on a showing that the defendant conducted "substantial and continuous local activity in the forum state."[8] Pohl does not assert this type of jurisdiction.

¶ 10 "[S]pecific personal jurisdiction gives a court power over a defendant only with respect to claims arising out of the particular activities of the defendant in the forum state" and only if the defendant has

---

2. *Pohl, Inc. of Am. v. Webelhuth*, 2007 UT App 225, ¶ 1, 164 P.3d 1272.

3. Prior to 2008, the Utah long-arm statute was contained in Utah Code section 78–27–24. In 2008, the statute was amended and renumbered. The relevant amendments were minor and non-substantive. We therefore cite to the current version of the statute.

4. *Wasatch County v. Okelberry*, 2008 UT 10, ¶ 8, 179 P.3d 768 (internal quotation marks omitted).

5. *D.A. v. State (In re W.A.)*, 2002 UT 127, ¶ 8, 63 P.3d 607.

6. *Arguello v. Indus. Woodworking Mach. Co.*, 838 P.2d 1120, 1121 (Utah 1992).

7. *Rocky Mountain Claim Staking v. Frandsen*, 884 P.2d 1299, 1301 (Utah Ct.App.1994) ("Personal jurisdiction means the power to subject a particular defendant to the decisions of the court." (internal quotation marks omitted)).

8. *Arguello v. Indus. Woodworking Mach. Co.*, 838 P.2d 1120, 1122 (Utah 1992) (emphasis omitted).

"certain minimum local contacts." [9] Whether we have specific jurisdiction depends on two inquiries. "First, do [the plaintiff's] claims arise from one of the activities listed in the [long-arm] statute," and second, whether the "defendant's contacts with this forum [are] sufficient to satisfy the due process clause of the fourteenth amendment." [10] In determining whether specific jurisdiction exists, our analysis begins with the long-arm statute. "If the relevant state statute does not permit jurisdiction, then the inquiry is ended; if it does, then the question is whether the statute's reach comports with due process." [11]

¶ 11 Accordingly, we first analyze whether the court of appeals correctly interpreted Utah's long-arm statute, Utah Code section 78B–3–205. Second, we analyze whether the court of appeals correctly concluded that asserting jurisdiction over the defendants would violate due process.

## I. THE COURT OF APPEALS ERRED BY INTERPRETING UTAH'S LONG–ARM STATUTE TOO NARROWLY

¶ 12 Utah's long-arm statute provides: "[A]ny person . . . whether or not a citizen or resident of this state, who, in person or through an agent, does any of the following enumerated acts is subject to the jurisdiction of the courts of this state as to any claim arising out of or related to [the enumerated acts]." [12] The relevant enumerated acts in this case are (1) "the transaction of any business within this state" and (2) "the causing of any injury within this state whether tortious or by breach of warranty." [13]

¶ 13 The court of appeals concluded that Pohl could not satisfy the tortious injury

requirement because "the causing of financial injury to a Utah business has been flatly rejected by the Utah courts as a basis for exercising personal jurisdiction." [14] We hold that the court of appeals interpreted this requirement too narrowly. The court of appeals also held that the "transaction of any business" requirement could not be met because the defendants did not "physically conduct[ ] business within Utah" or "purposefully direct[ ] mail or wire communications to Pohl in Utah." [15] Although we clarify that this limitation is more properly recognized as a due process limitation on jurisdiction, we agree with the court of appeals on this point.

### A. The Tortious Injury Requirement

¶ 14 The court of appeals erroneously concluded that " 'the causing [of] financial injury to a Utah business has been flatly rejected by the Utah courts as a basis for exercising specific personal jurisdiction.' " [16] This interpretation of the injury requirement is erroneous because it unnaturally constricts the plain language of the long-arm statute and does not comport with legislative intent. Moreover, it oversimplifies the case law regarding long-arm jurisdiction.

¶ 15 The plain language of the long-arm statute asserts jurisdiction over "claim[s] arising out of or related to" the "causing of *any* injury within this state whether tortious or by breach of warranty." [17] Nothing in the plain language of the statute distinguishes between financial injuries and other injuries. Furthermore, section 78B–3–205 expressly states the legislature's intent that the long-arm statute "be applied so as to assert jurisdiction over non-

9. *Id.* (emphasis omitted).

10. *Anderson v. Am. Soc'y of Plastic & Reconstructive Surgeons*, 807 P.2d 825, 826 (Utah 1990); *see also Arguello*, 838 P.2d at 1122 (explaining that the ability to exercise specific jurisdiction over a nonresident defendant depends on two factors: "the breadth of the forum state's jurisdictional statute and the due process limitations on jurisdiction imposed by the Fourteenth Amendment to the United States Constitution.").

11. *Arguello*, 838 P.2d at 1122.

12. Utah Code Ann. § 78B–3–205 (Supp.2008).

13. *Id.* § 78B–3–205(1), (3).

14. *Pohl, Inc. of Am. v. Webelhuth*, 2007 UT App 225, ¶ 11, 164 P.3d 1272 (alterations omitted) (internal quotation marks omitted).

15. *Id.* ¶ 9.

16. *Id.* ¶ 11 (alteration in original) (quoting *Patriot Sys., Inc. v. C–Cubed Corp.*, 21 F.Supp.2d 1318, 1321 (D.Utah 1998)).

17. Utah Code Ann. § 78B–3–205(3) (emphasis added).

resident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." [18] We have "explicitly upheld that policy," and any defendant arguing that the long-arm statute is less comprehensive than the Due Process Clause faces an uphill battle, as we have stated in the past that "any set of circumstances that satisfies due process will also satisfy the long-arm statute." [19]

▊ ¶ 16 While it is true that financial injury alone cannot establish jurisdiction because such a rule "would lead to the unacceptable proposition that jurisdiction could be established anywhere a plaintiff might locate," [20] the suggestion that financial injuries cannot provide the basis for jurisdiction at all is an oversimplification of the law. The cases relied on by the court of appeals in concluding that economic injuries provide an insufficient basis for jurisdiction are cases in which the only injuries suffered in the state were the economic consequences of torts directed elsewhere.

¶ 17 For example, in *Harnischfeger Engineers, Inc. v. Uniflo Conveyor, Inc.*, no tortious injury occurred in Utah.[21] The plaintiff's tortious injury argument was based on a letter sent by the defendant's Kansas office to a postal service employee in Tennessee.[22] The defendant also sent copies of the letter to Virginia and to Illinois, but the letter was never published in Utah.[23] Thus, the tortious injury was "caused" in Kansas, Virginia and Illinois, but not in Utah. The letter "[did] not implicate Utah in anyway," but the plaintiff argued that tortious injury occurred in Utah because the plaintiff's business in Utah suf-

fered because of the letter.[24] The court properly rejected this argument as an insufficient basis for jurisdiction.[25] While the economic consequences of the tortious injury may have been *felt* in Utah, the tortious injury itself was not *caused* in Utah.

¶ 18 Similarly, in *Patriot Systems, Inc. v. C–Cubed Corp.*, the plaintiff, a Utah corporation that developed, manufactured, and sold computer software, alleged that the defendant, a computer software company in Virginia, had intentionally interfered with economic relations, misappropriated trade secrets, infringed the plaintiff's copyright, and engaged in unfair competition.[26] The court found that the plaintiff had failed to demonstrate that the long-arm statute reached the defendant because the plaintiff did "not allege[ ] defendant committed these acts in Utah. Rather, the essence of plaintiff's complaint is that, because of defendant's conduct, plaintiff has suffered financial injury in Utah where it does business." [27] Again, the plaintiff felt the injury in Utah, but the torts occurred elsewhere and there was no evidence that the defendant had directed its tortious activity at Utah. These cases stand for the proposition that a plaintiff cannot claim that a tortious injury has been "caused" in Utah by showing a diminished bank account in Utah when the tortious activity was not directed toward Utah.

▊ ¶ 19 We acknowledge the analytical difficulty of distinguishing between the satisfaction of minimum contacts in the due process analysis and the satisfaction of the long-arm statute. For this reason, "we often assume the application of the statute—and go straight to the due process issue." [28] Never-

**18.** *Id.* § 78B–3–201(3).

**19.** *SII MegaDiamond, Inc. v. Am. Superabrasives Corp.*, 969 P.2d 430, 433 (Utah 1998).

**20.** *Burt Drilling, Inc. v. Portadrill*, 608 P.2d 244, 250 (Utah 1980); *see also STV Int'l Mktg. v. Cannondale Corp.*, 750 F.Supp. 1070, 1075 (D.Utah 1990) ("[L]oss of profits within a state in which a place of business is maintained simply is an insufficient basis on which to find that the injury occurred within that state as compared with the impact of actual business lost in another state.").

**21.** 883 F.Supp. 608 (D.Utah 1995).

**22.** *Id.* at 613.

**23.** *Id.*

**24.** *Id.*

**25.** *Id.*

**26.** 21 F.Supp.2d 1318, 1320 (D.Utah 1998).

**27.** *Id.* at 1321.

**28.** *Anderson v. Am. Soc'y of Plastic & Reconstructive Surgeons*, 807 P.2d 825, 827 (Utah 1990).

theless, it is important to articulate whether the limitation on jurisdiction stems from the breadth of the long-arm statute or whether it stems from the principles of due process. Contrary to the court of appeals' conclusion, the plain language of the long-arm statute does not exclude financial injuries caused by tortious actions, and any such limitation must come from the Due Process Clause, which we analyze below.

 ¶ 20 Thus, to satisfy the long-arm statute requirement, a plaintiff must allege only that the defendants caused a tortious injury in Utah and that the plaintiff's claims arise out of the tortious injury. Pohl has satisfied this requirement by alleging that it was the target of a civil conspiracy to commit tortious interference with Pohl's contract and to interfere with Pohl's prospective economic relations. Pohl has alleged that the defendants directed their conspiracy toward Utah and knew that their actions would harm Pohl in Utah. Moreover, in contrast to the two cases discussed above, Pohl has also articulated injuries suffered in Utah that consist of more than a diminished bank account. For example, Pohl's primary place of business is Utah, where it spent money and resources to satisfy the panel order. In addition, after purported measurement errors delayed the production schedule, Pohl entered into a contract with its parent company in Germany to expedite delivery of the panels. Finally, Pohl will not recover any of these expenses as a result of the defendants' allegedly tortious activities. These injuries are the direct result of the defendants' alleged tortious interference with the contract. Therefore, Pohl successfully pled facts showing that the defendants caused tortious injuries in Utah and accordingly Pohl satisfied the requirement of the long-arm statute.

### B. The Transaction of Business Requirement

¶ 21 Pohl also argues that the long-arm statute applies to the defendants because they transacted business in Utah. The legislature broadly defined the "transaction of business within this state" as the "activities of a nonresident person, his agents, or representatives in this state, which affect persons or businesses within the state."[29] Pohl argues that the use of Pohl panels on the Project required the defendants to communicate with Pohl through a series of letters and faxes regarding the dimensions and specifications of the panels, and that these communications constitute the transaction of business and bring the defendants within the reach of the long-arm statute. Pohl's argument seems to rely on two underdeveloped theories. First, these communications "affected" Pohl because in response to the scheduling demands imposed by Bret Miller, ISME and Webelhuth, Pohl contracted with its parent company in Germany to fabricate the panels and arranged for air freight from Germany. Second, TAB acted as an agent or a representative for Bret Miller, ISME and Webelhuth because TAB's communications with Pohl made the procurement of the panels possible and the panels were necessary to complete the project.

¶ 22 The court of appeals rejected Pohl's argument, concluding that the plain language of the statute requires that "at least some activities must occur within Utah."[30] While we believe that this requirement is more properly recognized as a due process limitation, we agree with the result reached by the court of appeals because we do not believe that the defendants "purposefully directed" their efforts toward conducting business in Utah.[31] To the contrary, it appears that the defendants purposefully avoided conducting business in Utah by hiring TAB as a subcontractor responsible for hiring Pohl. While Pohl may be able to satisfy minimum contacts by showing that TAB acted as an agent or a representative of the defendants in Utah, Pohl has not developed this argument beyond a statement of facts suggesting this

---

**29.** Utah Code Ann. § 78B–3–202(2).

**30.** *Pohl*, 2007 UT App 225, ¶ 9, 164 P.3d 1272.

**31.** *See SII MegaDiamond*, 969 P.2d at 435 (" 'So long as a commercial actor's efforts are "purposefully directed" towards residents of another

state, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.' " (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985))).

type of relationship. Because the agency argument was not thoroughly developed, and because we conclude that Pohl can satisfy the long-arm statute based on the tortious injury requirement, we need not, and do not, decide whether the facts alleged by Pohl are sufficient to support a finding that defendants transacted business in Utah.

## II. THE COURT OF APPEALS ERRED BY CONCLUDING THAT THERE WERE INSUFFICIENT MINIMUM CONTACTS BETWEEN THE DEFENDANTS AND UTAH TO SATISFY FEDERAL DUE PROCESS REQUIREMENTS

¶ 23 Federal due process requires that in order to subject a defendant to specific personal jurisdiction, there must be "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." [32] The purpose of requiring minimum contacts between the defendant and the forum state is to ensure that courts only exert jurisdiction in cases where the defendant creates a "substantial connection with the forum state" such that the defendant "should reasonably anticipate being haled into court there." [33] For this reason, "[e]ach defendant's contacts with the forum State must be assessed individually." [34] Finally, even if there are minimum contacts,

"the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." [35]

¶ 24 "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.' " [36] The essential question is whether the defendant "purposefully and voluntarily direct[ed] his activities toward the forum so that he should expect ... to be subject to the court's jurisdiction based on his contacts with the forum." [37] A defendant may direct its activities toward the forum by "purposefully avail[ing] itself of the benefits of conducting business" in the forum state,[38] or by purposefully directing tortious activity toward the forum state.[39]

¶ 25 The premise of the conclusion reached by both the court of appeals and the trial court was that because all of the defendants' allegedly tortious actions took place in Missouri, no minimum contacts existed. This approach erroneously ignores the fact that a tort is incomplete without an injury, and thus the place of injury is an important component of the minimum contacts analysis.[40] Moreover, "within the rubric of 'personal availment' the Court has allowed the exercise of jurisdiction over a defendant whose only 'contact' with the forum state is the 'purposeful direction' of a *foreign* act having *effect* in the forum state." [41]

---

**32.** *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotation marks omitted); *see also MFS Series Trust III v. Grainger,* 2004 UT 61, ¶ 10, 96 P.3d 927.

**33.** *MFS Series Trust III,* 2004 UT 61, ¶ 10, 96 P.3d 927 (internal quotation marks omitted).

**34.** *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

**35.** *MFS Series Trust III,* 2004 UT 61, ¶ 10, 96 P.3d 927 (internal quotation marks omitted); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477–78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Fenn v. Mleads Enters. Inc.,* 2006 UT 8, ¶ 10, 137 P.3d 706 ("Thus, a Utah state court may assert specific personal jurisdiction over a foreign defendant only if (1) the defendant has minimum contacts with Utah and (2) the assertion of jurisdiction would not offend the traditional notions of fair play and substantial justice.").

**36.** *Calder,* 465 U.S. at 788, 104 S.Ct. 1482 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).

**37.** *Pavlovich v. Super. Ct. of Santa Clara,* 29 Cal.4th 262, 127 Cal.Rptr.2d 329, 58 P.3d 2, 7 (2002) (internal quotation marks omitted).

**38.** *Fenn,* 2006 UT 8, ¶ 13, 137 P.3d 706.

**39.** *See, e.g., Calder,* 465 U.S. at 788–89, 104 S.Ct. 1482.

**40.** *See Kailieha v. Hayes,* 56 Haw. 306, 536 P.2d 568, 569 (1975) ("A tort is committed where the injury occurs, and the phrase 'tortious act' encompasses the injurious consequences of an act.").

**41.** *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986).

¶ 26 For example, in *Calder v. Jones*, the Supreme Court recognized that when "intentional, and allegedly tortious, actions [are] expressly aimed at [a forum state]," and where the defendants "knew that the brunt of that injury would be felt by respondent in the State in which she lives and works," then the defendants "must reasonably anticipate being haled into court there." [42] In *Calder*, two reporters wrote and edited a defamatory article about Shirley Jones, a professional entertainer, in the *National Enquirer*.[43] The reporters were from Florida, where they did their writing, research and publishing. They alleged that they did not go to California to work on the story.[44] Jones lived and worked in California.[45] In finding jurisdiction, the Supreme Court explained that "California is the focal point both of the story and of the harm suffered. Jurisdiction over [the reporters] is therefore proper in California based on the 'effects' of their Florida conduct." [46] Because the reporters knew that their tort would cause harm in California, the Supreme Court reasoned that the reporters "must reasonably anticipate being haled into court" in California to answer for their actions.[47]

¶ 27 In *Harris Rutsky & Co. Insurance Services, Inc. v. Bell & Clements Ltd.*, the Ninth Circuit rejected the same argument that the defendants make here.[48] The defendants in *Harris Rutsky* argued that jurisdiction was improper in California because "the conduct [forming] the basis for the alleged torts—interference with contract and business relations—took place in London." [49] Relying on the "effects" test derived from *Calder*, the Ninth Circuit explained that the purposeful availment prong "may be satisfied if the defendant is alleged to have (1) committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state." [50] The court concluded that the "effects" test was more than satisfied because (1) the defendants were alleged to have committed an intentional tort—interference with contractual and economic relationships; (2) the defendants knew that the plaintiff corporation was a California resident, and so the alleged acts were expressly aimed at California; and (3) the plaintiff was a California corporation with its principal place of business in California, and the brunt of the harm was therefore felt in California.[51]

■ ¶ 28 The minimum contacts analysis in this case is complicated by the fact that there are several defendants, all alleged to be involved in a conspiracy to harm Pohl. Generally, "[e]ach defendant's contacts with the forum State must be assessed individually."[52] Plaintiff, however, asks us to adopt a conspiracy theory of jurisdiction, which imputes minimum contacts to all members of a conspiracy if one member took a substantial and overt act in furtherance of the conspiracy in the forum state. "The conspiracy theory of personal jurisdiction is based on the time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy." [53]

■ ¶ 29 We see no need to adopt the conspiracy theory of jurisdiction in this case because the *Calder* "effects" test adequately addresses the issue. In Utah, civil conspiracy requires proof of five elements: "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action,

---

**42.** 465 U.S. at 789–90, 104 S.Ct. 1482 (internal quotation marks omitted).

**43.** *Id.* at 784, 104 S.Ct. 1482.

**44.** *Id.* at 785–86, 104 S.Ct. 1482.

**45.** *Id.* at 784, 104 S.Ct. 1482.

**46.** *Id.* at 789, 104 S.Ct. 1482.

**47.** *Id.* at 790, 104 S.Ct. 1482 (internal quotation marks omitted).

**48.** 328 F.3d 1122 (9th Cir.2003).

**49.** *Id.* at 1131.

**50.** *Id.*

**51.** *Id.*

**52.** *Calder*, 465 U.S. at 790.

**53.** *Textor v. Bd. of Regents*, 711 F.2d 1387, 1392 (7th Cir.1983) (alteration in original) (internal quotation marks omitted).

(4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." [54] "In a conspiracy that results in tort liability, the cause of action for which the co-conspirators are ultimately held liable is not the tort resulting in the harm, but for the conspiracy that led to the harm. These are separate and distinct causes of action." [55] Thus, under the *Calder* "effects" test, to establish jurisdiction over members of a conspiracy, the plaintiff must allege (1) that the defendants were engaged in a conspiracy, which is an intentional tort, (2) that the conspiracy was expressly aimed at the forum state, and (3) that the conspiracy caused harm, the brunt of which was suffered, and the defendants knew was likely to be suffered, in the forum state. By requiring that the defendants intentionally direct their tortious acts at Utah, this approach ensures that the members of the conspiracy "will not be haled into [Utah's courts] solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." [56]

¶ 30 Although this principle is easily articulated, its application is more complicated because asserting jurisdiction over members of a conspiracy could threaten to unravel the individualized analysis required for minimum contacts. For this reason, "a bare allegation of a conspiracy between the defendant and a person within the personal jurisdiction of the court is not enough" to establish jurisdiction. [57] Because the plaintiff is relying on the existence of a conspiracy to establish jurisdiction over the defendants, the plaintiff bears the burden of clearly alleging facts that demonstrate the existence of a conspiracy. [58] This burden "cannot be satisfied by purely conclusory allegations or ... generalized averments." [59] Instead, "[t]he complaint must set forth reasonably definite factual allegations, either direct or inferential, regarding each material element" needed to show a civil conspiracy. [60] And because jurisdiction will often "turn[ ] on the same facts as the merits of the case," the principles articulated in *Anderson v. American Society of Plastic & Reconstructive Surgeons* regarding pretrial determinations of jurisdiction apply. [61] Specifically, when reviewing documentary evidence, we accept the plaintiff's factual allegations as true, "unless specifically controverted by the defendant's affidavits or by depositions, but any disputes in the documentary evidence are resolved in the plaintiff's favor." [62] Moreover, at the preliminary stages, the plaintiff is only required to make a prima facie showing of personal jurisdiction." [63] Furthermore, "if the plaintiff has made a prima facie showing ... jurisdiction is determined by trial on the merits" because a pretrial evidentiary hearing would "infringe[ ] on the right to a jury trial" and would waste judicial resources by requiring the court to hear the same evidence twice. [64]

¶ 31 Because this standard differs significantly from the standard applied by the district court or the court of appeals, we remand for further proceedings consistent with this opinion. On remand, to the extent that the plaintiff requests leave to amend, it would appear to be appropriate to allow an opportunity to amend in light of the applicable standard that we announce today.

---

**54.** *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790 (Utah Ct.App.1987).

**55.** *Jedrziewski v. Smith*, 2005 UT 85, ¶ 10, 128 P.3d 1146.

**56.** *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174 (citations and internal quotation marks omitted).

**57.** *Stauffacher v. Bennett*, 969 F.2d 455, 460 (7th Cir.1992).

**58.** *Cf. United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir.1992) (explaining that for certain issues, like standing, that are "fundamental to the ability to maintain a suit ... the Court has saddled the complainant with the burden of clearly alleging facts sufficient to ground standing ... [and] that, where standing is at issue, heightened specificity is obligatory at the pleading stage").

**59.** *Id.*

**60.** *Id.*

**61.** 807 P.2d 825, 826–27 (Utah 1990).

**62.** *Id.* at 827.

**63.** *Id.*

**64.** *Id.*

## CONCLUSION

¶ 32 The Utah long-arm statute does not distinguish between "financial injuries" and other tortious injuries. Because the legislature has directed that we interpret the long-arm statute to extend to the limits of the Due Process Clause, as long as a plaintiff alleges that the defendant caused an injury in Utah, any limitation on the type of injury that this court will recognize is more properly recognized as a due process limitation. We do not specifically adopt the "conspiracy theory of jurisdiction" in this case because we believe that jurisdiction can be established over the defendants under the *Calder* "effects" test by showing that the defendants were engaged in a conspiracy that was expressly aimed at Utah and that the conspiracy caused harm in Utah, as the defendants knew it would. Because the standard we articulate differs significantly from the standard applied by the courts below, we remand for further proceedings consistent with this opinion.

¶ 33 Chief Justice DURHAM, Associate Chief Justice DURRANT, and Judge BACKLUND concur with Justice PARRISH'S opinion.

¶ 34 Justice NEHRING does not participate herein; District Judge JOHN BACKLUND sat.

WILKINS, Justice, dissenting:

¶ 35 I respectfully differ with my colleagues. I would affirm the court of appeals decision in all regards. While it is possible to draw the distinctions described in the opinion of Justice Parrish, I believe to do so invites other jurisdictions to do so as well, and would subject Utah citizens and companies to unnecessarily broad exposure to suit elsewhere. In this matter, the actions complained of, while clearly impacting the Utah plaintiff, just as clearly occurred in Missouri. None of the acts complained of occurred in Utah. I believe defining them as doing so violates the due process guarantees of the United States Constitution.